UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAMONA CONTRERAS, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 3495 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED OF OMAHA LIFE INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ramona Contreras filed this lawsuit under § 502(a)(1)(B) of the Employee Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover long-term disability ("LTD") benefits under a plan that her former employer, Flexible Steel Lacing Company ("Flexco"), established through Defendant United of Omaha Life Insurance Company. Doc. 1. The parties agreed to submit this matter for judgment on the administrative record under Federal Rule of Civil Procedure 52(a). Docs. 16, 25, 28; *see Kuznowicz v. Wrigley Sales Co.*, 2013 WL 4052381, at *1 (N.D. Ill. Aug. 12, 2013) (using this procedure in a § 1132(a)(1)(B) case). Having carefully reviewed the record, the court enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be considered conclusions of law, they shall be deemed conclusions of law, and vice versa. For the reasons stated below, Contreras's motion for judgment is granted and United of Omaha's cross-motion is denied.

**Findings of Fact**

1. Contreras worked as a Cell Operator for Flexco from 2010 until November 2012. Doc. 35 at ¶ 8; Doc. 38 at ¶¶ 5, 65. Her duties included packing steel lacing, loading a machine with steel lacing for packing, and labeling and palletizing the packages. Doc. 38 at ¶ 65.

1

2. Contreras suffered from several medical conditions, including osteoarthritis, degenerative disc disease, bilateral medial and lateral elbow epicondylitis, and bilateral shoulder pain. *Id*. at ¶ 20. Her pain drastically worsened in October 2012, *id*. at ¶¶ 24-27, and she stopped working the following month, *id*. at ¶¶ 5, 32.

3. United of Omaha is an insurance company that funds the disability benefits afforded under Flexco's employee welfare benefit plan, serves as the claim review fiduciary of the plan, and is responsible for paying LTD benefits if all eligibility criteria are met. Doc. 35 at ¶ 6; Doc. 38 at ¶ 6. The eligibility criteria are set forth in United of Omaha's Group Policy No. GLTD-ADS5 ("the Policy"). Doc. 35 at ¶ 1; Doc. 24-1 at 1-54.

4. The Policy provides LTD benefits for individuals who are "unable to perform all of the Material Duties of any Gainful Occupation." Doc. 35 at ¶ 9; Doc. 38 at ¶ 7.

5. The Policy defines Gainful Occupation as "an occupation, for which You are reasonably fitted by training, education or experience, [and] is or can be expected to provide You with Current Earnings at least equal to 85% of Basic Monthly Earnings within 12 months of Your return to work." Doc. 24-1 at 48.

6. 85% of Contreras's Basic Monthly Earnings is $2,808.17 per month. Doc. 38 at ¶ 85.

7. United of Omaha terminated Contreras's disability benefits as of May 5, 2015, reasoning that she was not disabled from any Gainful Occupation from which she could earn at least $2,808.17 per month within 12 months of her return to work. *Id*. at ¶ 14; Doc. 24-2 at 715.

8. Vocational consultant Patricia A. Thal prepared two transferrable skills analysis reports in connection with Contreras's benefits claim: an initial report dated January 12, 2015,

Doc. 24-3 at 170-172; and an updated report dated March 6, 2015, *id*. at 28-29, that took into account additional information about Contreras's medical restrictions. Doc. 35 at ¶¶ 47-48.

9. Thal reported that she had reviewed documents regarding Contreras's education, training, and work experience, and that she had "consulted standard vocational resources, e.g. the Dictionary of Occupation Titles (DOT), the Occupational Outlook Handbook (OOH), and the Occupational Information Network (O*NET)/Standard Occupational Classification (SOC) coding system, as well as internet job boards, e.g. Indeed.com." Doc. 24-3 at 28, 170.

10. Thal opined that Contreras possessed skills related to:

- Monitoring/assessing performance of self, other individuals, or organizations to make improvements or take corrective action.

- Basic computer skills to enter, retrieve, and maintain information.

- Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times.

- Actively looking for ways to help people.

- Being aware of others' reactions and understanding why they react as they do.

- Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions or approaches to problems.

- Understanding written sentences and paragraphs in work related documents.

- Teaching others how to do something.

- Persuading others to change their minds or behavior.

- Talking to others to convey information effectively.

- Managing one's own time and the time of others.

- Adjusting actions in relation to others' actions.

- Considering the relative costs and benefits of potential actions to choose the most appropriate one.

Doc. 38 at ¶ 84.

11. Thal's second report opined that the job of Order Clerk was the only occupation "consistent with [Contreras's] training, education, and/or work experience" that was "within [Contreras's] physical capabilities" and that would satisfy the Policy's wage requirement. Doc. 38 at ¶¶ 85, 88; Doc. 24-3 at 28-29. Thal cited the Bureau of Labor Statistics ("BLS") May 2013 50th percentile wage data for Order Clerks in the Chicago-Joliet-Naperville, Illinois area— $2,897.50 per month—and concluded that "[w]ith reasonable vocational certainty, Ms. Contreras would be able to garner the wages noted." Doc. 38 at ¶ 86; Doc. 24-3 at 29.

12. Thal did not offer an opinion on how long it would take Contreras after starting work as an Order Clerk to garner the BLS median wage or the threshold $2,808.17 monthly wage required under the Policy. Doc. 24-3 at 28-29.

13. Vocational expert James J. Radke prepared a vocational evaluation report in connection with Contreras's benefits claim. Doc. 38 at ¶ 91; Doc. 24-1 at 440-42. Radke's report described Contreras's educational and vocational background as follows:

> Ms. Contreras is a high school graduate; she has no additional post high school education; she has essentially no training or experience in data input or computer operation. She has taken 2 months of a 9 month training program when she stopped before completing. She has completed no training in computer/clerical operations, and she did *not* use a computer in any of her jobs.
>
> Regarding Ms. Contreras' work history, her most recent position was that of a packer. …
>
> In addition to this, Ms. Contreras has worked as a companion and as a home health aide. Both of these positions are at the lowest end of semi-skilled with a Specific Vocational Preparation (SVP) of 3 and having minimal transferable work skills.

Doc. 38 at ¶ 93.

4

14. Radke's report stated that Contreras "has minimal to no transferable work skills" and that "nearly all of the bullet points regarding work skills [in Thal's report] are not transferable work skills, but traits or potential aptitudes." *Id*. at ¶¶ 94, 97; *see also id*. at ¶¶ 95-96, 98 (disputing that Contreras had the particular skills that Thal identified).

15. Radke's report concluded:

> Therefore, it is my strong opinion Ms. Contreras does not have transferable work skills to perform alternate jobs in the regional economy within her exertional level. Furthermore, the wages represented for customer service positions are simply not relevant to Ms. Contreras since she does not have the pertinent work capabilities. She does not qualify to perform these duties. Hence, she would not be able to obtain the wages claimed for such a position. If Ms. Contreras would have extensive training for these positions, it would be my view she would start at the entry level of wages for a customer service or order taker position.

*Id*. at ¶¶ 99-100.

16. According to Radke, the entry level wage for an Order Clerk is $2,271 per month. *Id*. at ¶ 100.

17. The Dictionary of Occupational Titles ("DOT") describes the occupation of "Order Clerk" as follows:

> Processes orders for material or merchandise received by mail, telephone, or personally from customer or company employee, manually or using computer or calculating machine: Edits orders received for price and nomenclature. Informs customer of unit prices, shipping date, anticipated delays, and any additional information needed by customer, using mail or telephone. Writes or types order form, or enters data into computer, to determine total cost for customer. Records or files copy of orders received according to expected delivery date. May ascertain credit rating of customer … . May check inventory control and notify stock control departments of orders that would deplete stock. May initiate purchase requisitions. May route orders to departments for filling and follow up on orders to ensure delivery by specified dates and be designated Telephone-Order Dispatcher (clerical). May compute price, discount, sales representative's commission, and shipping charges. May prepare invoices and shipping documents, such as bill of lading … . May recommend type of packing or labeling needed on order. May receive and check customer complaints … . May confer with production, sales, shipping, warehouse, or common carrier personnel to expedite or trace

5

    missing or delayed shipments.  May attempt to sell additional merchandise to
    customer … .  May compile statistics and prepare various reports for
    management.  May be designated according to method of receiving orders as
    Mail-Order Clerk (clerical); Telephone-Order Clerk (clerical).

*Id*. at ¶ 89.

  18.  The DOT assigns an SVP rating of 4 to the occupation of Order Clerk.  *Ibid*.  The SVP rating is a measure of the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id*. at ¶ 82.

  19.  Contreras has never held a job with an SVP rating above 3.  *Id*. at ¶¶ 76-78, 93, 98.

  20.  Contreras held jobs as a packer, cashier, and home health aide since 2003.  Doc. 24-1 at 219.

  21.  Contreras made $8 per hour in both cashier jobs, earning $320 per week in 2008 and $160 per week in 2003 and 2004.  *Id*. at 219, 224-25.

  22.  Since leaving Flexco, Contreras has not obtained a position as an Order Clerk.  Doc. 38 at ¶¶ 5, 65.

## Conclusions of Law

  In applying the required "*de novo* review," the court does not review United of Omaha's decision to deny benefits, but rather makes an independent determination of whether Contreras is entitled to benefits under the United of Omaha plan.  *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) (observing that "'*de novo* review' is a misleading phrase" in the context of ERISA, which requires "an independent *decision* rather than 'review'"); *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (same).  "For claims seeking benefits under an ERISA plan, … at trial the plaintiffs would bear the burden of proving the

ERISA beneficiary's entitlement to the benefits of the insurance coverage, and the defendant insurer would bear the burden of establishing the beneficiary's lack of entitlement." *Diaz*, 499 F.3d at 643 (brackets and internal quotation marks omitted). The same standard applies in this "paper trial" under Rule 52. *See ibid*.

The key issues here are whether Contreras (1) is reasonably fitted, by training, education, or experience for the occupation of an Order Clerk, and (2) can be expected to receive at least 85% of her Basic Monthly Earnings (*i.e.*, $2,808.17) within 12 months of her return to work as an Order Clerk. Doc 27 at 2; Doc. 37 at 1. Both issues must be resolved in United of Omaha's favor in order for it to prevail. *See Diaz*, 499 F.3d at 643; Doc. 27 at 5; Doc. 37 at 3, 15. Whether Contreras is reasonably fitted for an Order Clerk position is a close question, particularly given the experts' conflicting assessments of her transferrable skills. *Compare* Doc. 24-3 at 170-72 *with* Doc. 24-1 at 440-42. Ultimately, that issue need not be resolved because, even if Contreras were reasonably fitted for an Order Clerk position, the record does not support the proposition that she could be expected to receive at least $2,808.17 per month as an Order Clerk within 12 months of starting work.

The parties agreed on the record that the expert reports and Contreras's vocational history are the only record evidence that bear on whether she could be expected to meet the Policy's wage requirement. None of those sources directly address Contreras's expected wage 12 months after starting work, so the court must make inferences based on the limited evidence they contain.

Thal's reports indicate that the median monthly wage for Order Clerks is $2,897.50—slightly higher than the $2,808.17 required under the Policy—and conclude that Contreras would be able to attain that wage to a "reasonable vocational certainty." Doc. 24-3 at 29, 172.

However, Thal does not address *when* she expects that Contreras would begin earning that amount, and her reports contain no analysis that could support the conclusion that Contreras's wages as an Order Clerk would approach the median wage within one year of her starting work. *Id*. at 28-29; 170-72. As United of Omaha's counsel acknowledged, the record contains no additional evidence suggesting that Contreras meets the Policy's earnings requirement:

> Q: What evidence in the record supports the proposition that Contreras could earn the median wage for Order Clerk within 12 months of starting work?
>
> A: Aside from the expert opinion, there is no evidence.

Radke's report does not address the 12-month timeframe either, but it does provide a crucial data point: the Order Clerk starting salary of $2,271 per month. Doc. 24-1 at 442. (Actually, Radke says that this is the starting salary for "a customer service or order taker position," *ibid*., but there is no reason to think that he was referring to something different than an Order Clerk, and United of Omaha does not argue otherwise. *Cf*. Doc. 38 at ¶ 89 (noting that the DOT entry for "Order Clerk" lists "customer-order clerk" and "order taker" as alternate job titles).)

Although United of Omaha contests Radke's credibility as a general matter, it does not argue that Radke's opinion regarding the Order Clerk starting salary is inaccurate. Doc. 37 at 2, 11-13. In any event, the court finds Radke's data credible. In sum, the expert reports indicate that if Contreras were to obtain an Order Clerk job, she would earn $2,271 per month at the outset and $2,897.50 per month at some future point, but they do not indicate that her monthly wage would reach $2,808.17 within one year. There is nothing in the record to suggest, and it is highly unlikely, that Contreras would receive a cumulative 23% raise during her first year on the job to bring her from the $2,271 starting monthly salary to a $2,808.17 monthly salary. It follows that the record, taken as a whole, yields the conclusion that Contreras could not be

8

expected to receive at least 85% of her Basic Monthly Earnings within 12 months of her commencing work as an Order Clerk.

Although the analysis could stop there, the court adds for good measure that Contreras's vocational history provides further support for this conclusion. Contreras has never worked in a clerical job, or in any job with an SVP rating as high as 4. Doc. 24-1 at 219, 440-42; Doc. 24-3 at 171. Her previous work as a cashier, which United of Omaha's briefing and oral argument treat as the vocational experience that best prepares her for an Order Clerk position, Doc. 37 at 2, 14, paid $8 per hour and $320 per week at most. Doc. 24-1 at 224-25. Thus, even if the cashier jobs Contreras held several years ago prepared her to perform the duties of an Order Clerk, they would be highly unlikely to motivate an employer to pay her at least $2,808.17 per month— approximately double her earnings as a cashier—within her first year working as an Order Clerk.

If the Policy imposed no time limit for Contreras to earn the required wage, Thal's reports might have been enough for United of Omaha to prevail. *See Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 360 (7th Cir. 2017). But that is not our case, and because the record cannot reasonably support the conclusion that Contreras would earn at least $2,808.17 per month within her first 12 months as an Order Clerk, she is entitled to LTD benefits under the Policy.

## Conclusion

For the foregoing reasons, Contreras is entitled to judgment. She is awarded benefits due to her since May 6, 2015, plus prejudgment interest at the prime rate. *See Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002) ("This presumption in favor of prejudgment interest awards is specifically applicable to ERISA cases. Whether to award an ERISA plaintiff pre-judgment interest is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities.") (internal citation and quotation marks omitted); *Gornstein*

*Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (advising district courts to use the prime rate for prejudgment interest where there is no statutory interest rate). Judgment will be entered in favor of Contreras and against United of Omaha. The parties are directed to confer on the appropriate calculations and to submit a proposed order reflecting those calculations by May 2, 2017.

April 25, 2017

United States District Judge